# In the United States Court of Federal Claims

No. 14-152C
(Filed Under Seal:  May 8, 2020)
(Reissued for Publication:  May 19, 2020)[*]
(Reissued Following Motion to Certify Interlocutory Appeal:  June 11, 2020)[**]

**************************************

| | |
|---|---|
| BRUCE REID et al., * | |
| * | Motion to Dismiss; RCFC 12(b)(1); RCFC |
| Plaintiffs, * | 12(b)(6); Jurisdiction; Standing; Derivative |
| * | Claims; Coercion; Agent; Collateral |
| v. * | Estoppel; Issue Preclusion; Conservator; |
| * | Conflict of Interest; Freddie; FHFA; |
| THE UNITED STATES, * | Certification of Interlocutory Appeal |
| * | |
| Defendant. * | |

**************************************

Robert C. Schubert, San Francisco, CA, for plaintiffs.

Kenneth M. Dintzer, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiffs in this case are shareholders of the Federal Home Loan Mortgage Corporation ("Freddie") who, through a shareholder derivative suit, challenge the actions of the United States during the conservatorship of Freddie.  Specifically, plaintiffs take issue with the conservator for Freddie amending a funding agreement between Freddie and the United States Department of the Treasury ("Treasury").  Based on the revisions to that agreement, plaintiffs seek the return of money illegally exacted, damages for breach of fiduciary duty, and compensation for a taking pursuant to the Fifth Amendment to the United States Constitution ("Constitution").  Defendant moves to dismiss plaintiffs' complaint, arguing that the court lacks subject-matter jurisdiction

---

[*]  The court initially issued this Opinion and Order under seal with instructions for the parties to propose any redactions.  The parties informed the court that no redactions were necessary to the Opinion and Order.

[**]  Following the issuance of this opinion, plaintiffs moved to certify the opinion for interlocutory appeal.  The court granted that motion on June 11 2020, and explained in that order that it would amend the opinion to incorporate the necessary language to certify the opinion. The language is set forth in Part VIII, infra.

over plaintiffs' claims, plaintiffs lack standing to pursue certain claims, and plaintiffs fail to state a claim upon which relief may be granted.  For the reasons stated below, the court denies defendant's motion to dismiss.

## I. BACKGROUND

### A. Freddie is a private company that is under the control of a conservator.

#### 1. Freddie operated independently before the financial crisis.

Congress created Freddie in 1970 to help the housing market; Freddie purchases and guarantees mortgages originated by private banks before bundling those mortgages into securities that are sold to investors.[1]  Am. Derivative Compl. ¶¶ 40-41, 44.  Freddie was initially part of the federal government before Congress reorganized it as a for-profit company owned by private shareholders in 1989.  Id. ¶¶ 42-43, 45.  Freddie issued its own common and preferred stock, id. ¶ 45, and its conduct is subject to Virginia law, id. ¶ 26.

Freddie, up until the financial crisis in the late 2000s, was consistently profitable and had not reported a full-year loss since becoming privately owned.  Id. ¶ 47.  Even when the financial crisis hit the mortgage market, Freddie continued to generate sufficient cash to pay its debts and retained sufficient capital to operate.  Id. ¶ 48.  Otherwise stated, Freddie was not in financial distress or otherwise at risk of insolvency.  Id. ¶¶ 48-52, 55.

#### 2. Congress created the Federal Housing Finance Agency to regulate Freddie and the Federal National Mortgage Association, and also authorized the agency to serve as a conservator for Freddie.

In the midst of the financial crisis during the summer of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified as amended in scattered sections of 12 U.S.C.).  In that statute, Congress created the Federal Housing Finance Agency ("FHFA") and provided it with supervisory and regulatory authority over the Federal National Mortgage Association ("Fannie") and Freddie ("Enterprise," when used for either entity; collectively, "Enterprises").  See 12 U.S.C. § 4511(a)-(b) (2018)

---

[1]  This background section is a less comprehensive version of the court's recitation of facts in Fairholme Funds, Inc. v. United States, 147 Fed. Cl. 1 (2019) ("Fairholme II"), motion to certify interlocutory appeal granted, 147 Fed. Cl. 126 (2020) ("Fairholme III").  The parties in this case have agreed that there is no material distinction between the facts relevant to this case and the relevant facts recited in Fairholme II.  The parties also agree that the court's reasoning in that opinion, when applied to plaintiffs' claims here, produces an analysis and result that are identical to the court's resolution, in Fairholme II, of defendant's motion to dismiss as to the shareholder derivative claims brought on behalf of Freddie.  In addition, much of the briefing considered by the court in Fairholme II applies directly to the parties' dispute here.  See Pls.' Supp'l Mem. in Opp'n to Def.'s Omnibus Mot. to Dismiss 1 n.2; Def.'s Notice Identifying Claims 6-9.

(stating that FHFA has "general regulatory authority" over Fannie and Freddie).[2]  Congress further authorized the FHFA Director to, in limited circumstances, appoint the FHFA as the conservator ("FHFA-C") for either Enterprise to reorganize, rehabilitate, or wind up its affairs.[3]  Id. § 4617(a)(2).  Specifically, the Director is authorized to appoint a conservator if, among other things, the Enterprise consents, is undercapitalized, or lacks sufficient assets to pay its obligations.  Id. § 4617(a)(3).[4]  The conservator, once appointed, functions independently; it is not "subject to the direction or supervision of any other agency of the United States or any State in the exercise of [its] rights, powers, and privileges . . . ."  Id. § 4617(a)(7).

Congress also delineated the scope of the FHFA-C's powers in HERA.  See generally id. § 4617.  As soon as it is appointed, the FHFA-C "immediately succeed[s] to . . . all rights, titles, powers, and privileges of the [Enterprise], and of any stockholder, officer, or director of such [Enterprise] with respect to the [Enterprise] and the assets of the [Enterprise] . . . ."  Id. § 4617(b)(2)(A).  Congress also conferred on the conservator the power to "[o]perate the [Enterprise]."  Id. § 4617(b)(2)(B).  Pursuant to that power, the conservator "may," among other things, "perform all functions of the [Enterprise]," "preserve and conserve the assets and property of the [Enterprise]," and "provide by contract for assistance in fulfilling any function . . . of the [conservator]."  Id.  The conservator "may" also "take such action as may be . . . necessary to put the [Enterprise] in a sound and solvent condition; . . . and appropriate to carry on the business of the [Enterprise] and preserve and conserve the assets and property of the [Enterprise]."  Id. § 4617(b)(2)(D).  Rounding out the panoply of powers, Congress also provided that the conservator "may . . . exercise . . . such incidental powers as shall be necessary to carry out [its enumerated powers]" and "take any action authorized by [12 U.S.C. § 4617(b)], which [it] determines is in the best interest of the [Enterprise] or the [FHFA]."  Id. § 4617(b)(2)(J).  By describing the FHFA-C's role primarily in terms of what powers it "may" exercise, see generally id. § 4617, Congress provided the FHFA-C with significant discretion on when or how it uses its powers, see United States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion.").  Simply stated, the FHFA has "extraordinarily broad flexibility to carry out its role as conservator."  Perry Capital LLC v. Mnuchin, 864 F.3d 591, 606 (D.C. Cir. 2017) ("Perry II"), cert. denied, 138 S. Ct. 978 (2018).

### 3. Congress authorized Treasury to purchase securities issued by Freddie.

At the same time that it established the FHFA, Congress authorized the Treasury Secretary to buy securities issued by Freddie in limited circumstances.  12 U.S.C. § 1455(*l*).

---

[2]  Congress has not amended the relevant portions of HERA since enacting the law in 2008.  The court, therefore, refers to the most recent version of the United States Code.

[3]  To avoid any ambiguity, the court uses "FHFA" to refer to the agency acting in its regulatory role and "FHFA-C" when discussing the agency acting as a conservator.

[4]  Congress enticed the Enterprises to consent to a conservatorship by insulating their board members from any liability to shareholders or creditors for agreeing in good faith to the FHFA's appointment of a conservator.  12 U.S.C. § 4617(a)(6).

Congress included a sunset clause on this power; the Secretary could not purchase securities after December 31, 2009.  Id. § 1455(*l*)(4).  Until that date, the Secretary was permitted to purchase the securities if he determined that doing so was necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect taxpayers.  Id. § 1455(*l*)(1)(B).  As part of his obligation to protect taxpayers, the Secretary could only purchase securities after considering:

(i)  The need for preferences or priorities regarding payments to the Government.

(ii)  Limits on maturity or disposition of obligations or securities to be purchased.

(iii)  [Freddie's] plan for the orderly resumption of private market funding or capital market access.

(iv)  The probability of [Freddie] fulfilling the terms of any such obligation or other security, including repayment.

(v)  The need to maintain [Freddie's] status as a private shareholder-owned company.

(vi)  Restrictions on the use of [Freddie's] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

Id. § 1455(*l*)(1)(C).

### 4.  The FHFA became the conservator for Freddie.

After Congress enacted HERA, Treasury "urg[ed]" the FHFA to place each Enterprise into conservatorship.  Am. Derivative Compl. ¶ 56.  The FHFA and Treasury subsequently sought to persuade Freddie's board of directors to consent to conservatorship.  Id. ¶ 214.  The board accepted that offer and consented to a conservatorship on September 6, 2008.  Id.  The conservatorship became effective on September 6, 2008.  Id. ¶¶ 54, 58, 214; see also 12 U.S.C. § 4617(a)(3)(I) (permitting the FHFA Director to appoint a conservator when "[t]he [Enterprise], by resolution of its board of directors or its shareholders or members, consents to the appointment").

### 5.  The FHFA-C contracted with Treasury to obtain funding for Freddie.

On September 7, 2008, the FHFA-C entered into a Preferred Stock Purchase Agreement ("PSPA") with Treasury for Freddie.  Am. Derivative Compl. ¶ 67.  Treasury entered into the agreement pursuant to its authority under HERA to buy Freddie's securities.  Id. ¶¶ 54, 67.  Under the PSPA, Treasury committed to provide up to $100 billion to Freddie to ensure that Freddie maintained a positive net worth.  Id. ¶ 67.  If Freddie's liabilities exceeded its assets,

then Freddie could draw on Treasury's funding commitment in an amount equal to the difference between Freddie's liabilities and assets.  Id.

In return for Treasury's funding commitment, Freddie surrendered stock, dividends, and commitment fees.  First, with respect to the stock, Treasury acquired one million shares of preferred stock in Freddie and warrants to purchase 79.9% of Freddie's common stock at a nominal price.  Id.  Treasury's preferred stock had an initial liquidation preference of $1 billion, but the amount increased dollar-for-dollar when Freddie drew on Treasury's funding commitment.  Id. ¶ 68.  In the event of a liquidation, Treasury was entitled to recover the full liquidation value of its shares before any other shareholder would receive compensation.  Id.  Second, Treasury bargained for the right to a quarterly cash dividend equal to 10% of its liquidation preference.  Id. ¶ 69.  If Freddie decided against paying a cash dividend in a specific quarter it could make an in-kind payment:  the value of the dividend would be added to the liquidation preference, and the dividend rate would increase to 12%.  Id.  Third, Treasury received the right to a quarterly commitment fee from Freddie, but Treasury could waive the fee each year.  Id. ¶ 70.  If Treasury did not waive the fee, the Enterprise could elect to pay the amount in cash or make an in-kind payment by increasing the liquidation preference.[5]  Id.

The FHFA-C and Treasury amended Freddie's PSPA on May 6, 2009, to increase Treasury's funding commitment from $100 billion to $200 billion.  Id. ¶ 72.  On December 24, 2009, the FHFA-C and Treasury executed another amendment to the PSPA; they abolished the specific dollar cap and replaced it with a formula to allow Treasury's total commitment to Freddie to exceed $200 billion.  Id. ¶ 73.

### 6. Freddie's finances improved during the conservatorship.

In the early stages of the conservatorship, Freddie reported large losses.  The bulk of the losses resulted from the FHFA-C writing down the value of deferred tax assets and designating large loan loss reserves.[6]  Id. ¶ 94.  Notwithstanding those on-paper losses, Freddie's cash receipts consistently exceeded its expenses; Freddie maintained net operating revenue in excess of its net operating expenses from the onset of the conservatorship under the PSPA and through the first two amendments to the agreement.  Id. ¶ 100.

In 2011 and into 2012, Freddie's financial outlook was promising.  In addition to an improvement in the housing market, Freddie began generating profits and anticipated losing less

---

[5]  Other terms of the PSPA granted Treasury significant control over Freddie's management decisions such as the issuance of stock, the transfer of assets, and the payment of dividends.  Fairholme II, 147 Fed. Cl. at 18.

[6]  A loan loss reserve is an entry on a company's balance sheet that reduces its net worth to reflect anticipated losses on mortgages that it owns.  Am. Derivative Compl. ¶ 98.  A deferred tax asset is an asset that may be used to offset future tax liability.  Id. ¶¶ 95-96.  A company must write down the value of that deferred asset if it is unlikely to be used to offset future taxable profits.  Id. ¶ 95.  This write down occurs, for example, if a company predicts it will not be profitable in the future.  Id. ¶ 96.

money on its newer mortgages.  Id. ¶¶ 102-16.  It was positioned to further improve its financial condition by settling lawsuits, id. ¶ 99, and revising its valuations of (1) deferred tax assets because of growing profits and (2) loan loss reserves because losses were less than expected, id. ¶¶ 101, 105, 115-17.  The FHFA-C and Treasury were aware of those forthcoming changes and Freddie's improving outlook.  Id. ¶ 117.  Otherwise stated, the FHFA-C and Treasury knew, by the summer of 2012, that Freddie was poised to generate profits in excess of its dividend obligations to Treasury.  Id.

### 7. Treasury and the FHFA-C agreed to a third amendment to the PSPA.

At an unspecified time prior to August 2012, Treasury and the FHFA-C began considering a third amendment to Freddie's PSPA.  Treasury was the driving force behind the initiative to amend the PSPA's terms.  Id. ¶ 126.  Indeed, an FHFA official reported in early August 2012 that Treasury was making a "renewed push" to implement a new amendment.  Id. ¶ 150 (quoting the FHFA official).  The FHFA-C learned of the proposed changes before Freddie; Treasury informed Freddie that the new terms were forthcoming and announced the changes to Freddie at a subsequent meeting.  Id. ¶¶ 150-52.  Treasury did not negotiate with the FHFA-C; the FHFA-C accepted the changes without advocating for different terms.  Id. ¶ 141.

Treasury and the FHFA-C decided to announce the changed terms in mid-August 2012 because, according to Treasury, Freddie would be reporting earnings exceeding its dividend obligation at the beginning of that month.  Id. ¶ 147.  On August 17, 2012, Treasury and the FHFA-C executed the third amendment to the PSPA ("PSPA Amendment").  Id. ¶ 118.  A key component of the amended PSPA is the requirement—referred to as the "Net Worth Sweep"—that Freddie pay Treasury a quarterly dividend equal to 100% of Freddie's net worth (except for a small capital reserve amount) rather than a dividend based on a set percentage of the liquidation preference.[7]  Id. ¶¶ 119, 154.  Additionally, under the amended PSPA, Freddie is not obligated to pay a periodic commitment fee.  See id. ¶¶ 128, 200; see also Fairholme II, 147 Fed. Cl. at 19.

### a. Treasury wanted to ensure that it benefited from the new terms.

With the PSPA Amendment, Treasury sought to secure a more beneficial arrangement for itself, as a representative for taxpayers.  During the lead-up to the PSPA Amendment, a Treasury official acknowledged in a December 2010 memorandum to the Treasury Secretary that the government was "committ[ed] to ensur[ing] existing common equity holders will not have access to any positive earnings from the [Enterprises] in the future."  Id. ¶ 129 (quoting the memorandum).  In another Treasury document, an official noted that the amended PSPA would put the taxpayer "in a better position" because, rather than having Treasury "limited to the 10% dividend," now "the taxpayer will benefit from all future earnings of the [Enterprises]."  Id. ¶ 143 (quoting the document).  Treasury recognized its goal of obtaining all of Freddie's profits

---

[7]  The capital reserve for Freddie started at $3 billion and was set to decrease to $0 by January 2018, but Freddie and Treasury agreed in December 2017 to reset the capital reserve amount to $3 billion in the first quarter of 2018.  Am. Derivative Compl. ¶ 119; Fairholme II, 147 Fed. Cl. at 19 n.5.

by executing the PSPA Amendment; when the changes were announced, it noted that "every dollar of earnings that [the Enterprises] generate will be used to benefit taxpayers." Id. ¶ 158 (quoting a Treasury press release).

### b. The FHFA-C agreed to changes that benefit Treasury.

For its part, the FHFA-C was operating under the belief that Treasury would benefit from the PSPA Amendment. Treasury anticipated that its receipts under the PSPA Amendment would exceed what it would be paid under the 10% dividend, and that the change would lead to a better outcome for Treasury. Id. ¶¶ 144, 161. FHFA officials also endorsed the objective of maximizing the benefits of the PSPA Amendment for taxpayers. Id. ¶¶ 164-70. Melvin Watt—a former FHFA Director—confirmed that he was concerned with how decisions affect the taxpayers and stated in an interview that "he does not 'lay awake at night worrying what's fair to the shareholders' but rather focuses on 'what is responsible for the taxpayers.'" Id. ¶ 170 (quoting the interview).

### c. Treasury and the FHFA understood that the PSPA Amendment would not facilitate Freddie exiting conservatorship.

Treasury was aware that the new terms of the PSPA were not conducive to Freddie exiting conservatorship. When announcing the PSPA Amendment, Treasury openly acknowledged that the new terms would "expedite the wind down of . . . Freddie." Id. ¶ 158 (quoting a Treasury press release). Treasury further explained that the new deal would ensure that Freddie "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in [its] prior form." Id. Indeed, a White House official sent a message to a Treasury official on the day the deal was announced noting that the PSPA Amendment "closed off [the] possibility that [Freddie] ever go (pretend) private again." Id. ¶ 159.

The FHFA shared a similar sentiment. The "FHFA mandated that Freddie . . . retain no capital and pay its entire net worth to Treasury [even though f]ederal regulators well understand such an arrangement is fundamentally unsafe and unsound." Id. ¶ 172. In other words, the FHFA sacrificed Freddie's interests as a corporation in favor of Treasury. Id. ¶ 178. The FHFA-C used its role as conservator to "prepare to wind down Freddie." Id. ¶ 204.

### d. Treasury has benefited from the PSPA Amendment at the expense of Freddie.

There are three significant effects that flowed from the PSPA Amendment. First, Treasury acquired all of Freddie's reasonable economic value because Treasury now will receive all of Freddie's future earnings. Id. ¶¶ 193, 197. Second, Treasury reaped a windfall of $52.35 billion in comparison to what it would have received absent changes to the PSPA. See id. ¶¶ 181-82 (alleging that Freddie paid Treasury $88.5 billion under the PSPA Amendment but would have only paid Treasury $36.15 billion under the previous terms). Third, Freddie can never be rehabilitated to a sound and solvent condition because, by transferring its profits to Treasury, Freddie will perpetually operate on the brink of insolvency. Id. ¶¶ 172, 184.

### B. Plaintiffs own Freddie stock.

The plaintiffs in this case are Bruce Reid and Bryndon Fisher, bringing derivative claims on behalf of Freddie. Mr. Reid owns common stock, and Mr. Fisher owns, jointly with Mr. Reid, junior preferred stock in Freddie. Id. ¶¶ 23-24. Plaintiffs owned Freddie stock on August 17, 2012, the time of the PSPA Amendment. Id. As stockholders of Freddie, plaintiffs presented a demand that the FHFA-C and Freddie litigate the claims in this suit against the United States, but their demand was refused. Id. ¶¶ 207-34.

## II. PROCEDURAL HISTORY

Plaintiffs filed their complaint on February 26, 2014.[8] After jurisdictional discovery proceeded in Fairholme, a related case, see supra note 1, plaintiffs filed their amended derivative complaint in this case on March 8, 2018. In their amended complaint, plaintiffs plead three derivative claims on behalf of Freddie. Plaintiffs first assert that the Net Worth Sweep constitutes a Fifth Amendment taking (count I) of Freddie's economic value. Plaintiffs next assert, in the alternative, that the Net Worth Sweep constitutes an illegal exaction (count II) of the payments Freddie made to Treasury after the PSPA Amendment. Plaintiffs also plead a breach-of-fiduciary-duty claim ("fiduciary duty claim") (count III), premised on the FHFA owing a fiduciary duty to Freddie once it became Freddie's conservator.

On October 1, 2018, defendant moved to dismiss—in a single, omnibus motion—the claims in this case and eleven related cases before the undersigned.[9] The plaintiffs in each of the twelve cases filed a response brief on their respective dockets; some of the plaintiffs relied on a joint brief, while others, as is the case here, filed a joint brief and a supplemental response brief. Defendant filed its omnibus reply brief in each of the cases on May 6, 2019. At the court's request, defendant filed a statement in which it identified which claims were the subject of each argument in its motion to dismiss ("notice of arguments"). The parties have fully briefed defendant's motion, and the court held a single oral argument on November 19, 2019, involving the plaintiffs from each of the twelve cases that defendant moved to dismiss. The plaintiffs in those cases collaborated during argument; each plaintiff argued some of the issues. Thus, the court infers that the plaintiffs in this case have adopted the favorable arguments made by the plaintiffs in the related cases to the extent that such arguments are relevant. Defendant's motion to dismiss is now ripe for adjudication.

## III. STANDARD OF REVIEW

_____

[8] A fuller recitation of the procedural history of this case and related cases is provided in Fairholme II, 147 Fed. Cl. at 21-23.

[9] The eleven related cases are Fairholme Funds, Inc. v. United States, No. 13-465C; Washington Federal v. United States, No. 13-385C; Cacciapalle v. United States, No. 13-466C; Fisher v. United States, No. 13-608C; Arrowood Indemnity Company v. United States, No. 13-698C; Rafter v. United States, No. 14-740C; Owl Creek Asia I, L.P. v. United States, No. 18-281C; Akanthos Opportunity Master Fund, L.P. v. United States, No. 18-369C; Appaloosa Investment Limited Partnership I v. United States, No. 18-370C; CSS, LLC v. United States, No. 18-371C; and Mason Capital L.P. v. United States, No. 18-529C.

In ruling on a motion to dismiss a complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), the court generally assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). With respect to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. Id. The allegations in the complaint must include "the facts essential to show jurisdiction." McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936). And, if such jurisdictional facts are challenged in a motion to dismiss, the plaintiff "must support them by competent proof." Id.; accord Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist." (citations omitted)). If the court finds that it lacks subject-matter jurisdiction, it must, pursuant to RCFC 12(h)(3), dismiss the complaint.

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief. Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."). To survive a motion to dismiss under RCFC 12(b)(6), a plaintiff must include in the complaint "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## IV.  SUBJECT-MATTER JURISDICTION

The court begins with jurisdiction because it is a "threshold matter." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). Subject-matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868). Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). Either party, or the court sua sponte, may challenge the court's subject-matter jurisdiction at any time. Arbaugh, 546 U.S. at 506; see also Jeun v. United States, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be unequivocally expressed." United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Any such waiver must be

narrowly construed.  Smith v. Orr, 855 F.2d 1544, 1552 (Fed. Cir. 1988).  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2018); White Mountain, 537 U.S. at 472.  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 298 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

Defendant challenges the court's jurisdiction to entertain plaintiffs' claims on a number of bases.  Specifically, defendant argues that plaintiffs have not asserted claims against the United States, and that the court lacks jurisdiction over the subject matter of certain claims.  The court addresses each of these contentions in turn.[10]

### A. Plaintiffs have asserted claims against the United States.

The court first considers whether plaintiffs have asserted claims against the United States, a necessary element of jurisdiction in the Court of Federal Claims.  As set forth in their amended derivative complaint, plaintiffs' Fifth Amendment takings and illegal-exaction claims are premised on actions taken by the FHFA-C and Treasury, while plaintiffs' fiduciary duty claim is premised on the FHFA-C's actions.  Defendant argues that the court lacks jurisdiction to consider any claims premised on the FHFA-C's or Treasury's conduct.  In response, plaintiffs contend that they have asserted claims against the government because (1) Treasury was involved in the challenged conduct, (2) the FHFA-C exercised nontraditional conservator powers such that its actions must be deemed those of the government, (3) the FHFA-C was coerced by the government, (4) the FHFA-C was the government's agent, and (5) the FHFA-C is a government actor.  The court addresses each contention in turn.

### 1. The court cannot exercise jurisdiction based on allegations of Treasury's involvement.

Plaintiffs initially argue that the court has jurisdiction over their Fifth Amendment takings and illegal-exaction claims because they have alleged the involvement of Treasury—indisputably a part of the federal government—in the action underlying these claims, i.e., the Net Worth Sweep.  Defendant counters that Treasury alone could not have implemented the PSPA Amendment, and Treasury's role as a counterparty to the voluntary agreement with Freddie is

---

[10]  In Fairholme II, the court addressed additional jurisdictional concerns that were not raised or are not implicated in this case.  See generally 147 Fed. Cl. at 24-25 (rejecting defendant's contention that the claims of the Fairholme plaintiffs were barred by 28 U.S.C. § 1500); 34-37 (rejecting the contention of a putative intervenor that the Court of Federal Claims lacks jurisdiction to entertain Fifth Amendment takings claims); 37-42 (holding that the court lacks jurisdiction to entertain a direct fiduciary duty claim or a direct implied-in-fact-contract claim).

not sufficient to establish jurisdiction over plaintiffs' takings claim.  Defendant further asserts that the court's order allowing jurisdictional discovery reflects that plaintiffs' allegations concerning Treasury alone are insufficient to confer jurisdiction.

The parties' dispute on the import of allegations concerning Treasury is ultimately immaterial in light of the court's determination, explained below, that the FHFA-C—the other party involved in the PSPA Amendment—is the United States.  Nonetheless, the court notes, as defendant asserts, that it implicitly acknowledged in its February 26, 2014 discovery order in the Fairholme case that the allegations concerning Treasury alone were insufficient to support jurisdiction.  In that order, the court permitted plaintiffs to conduct fact discovery on whether the FHFA-C was "the 'United States' for purposes of the Tucker Act."  Fairholme Funds, Inc. v. United States, 114 Fed. Cl. 718, 721 (2014).  The aforementioned discovery would have been unnecessary (and unwarranted) if, as plaintiffs assert, the court has jurisdiction over plaintiffs' claims based on their allegations concerning Treasury.

### 2.  The FHFA-C exercised its statutory conservatorship powers when it approved the PSPA Amendment for Freddie.

Plaintiffs next argue that the FHFA-C must be considered the United States because the FHFA-C acted beyond its authority when it expropriated Freddie's assets for the government's benefit.  Defendant counters that, irrespective of the "expropriation" label assigned by plaintiffs, the FHFA-C's execution of the PSPA Amendment was consistent with its statutory authority and purpose.

The FHFA-C is the United States for any claims challenging the conservator's conduct that exceeded the applicable statutory authority.  Cf. Slattery v. United States, 583 F.3d 800, 827-28 (Fed. Cir. 2009) (noting that the Federal Deposit Insurance Corporation ("FDIC") as receiver is the United States for claims premised on allegations that the receiver failed to distribute funds as required by statute).  Thus, resolving the parties' dispute requires determining whether the FHFA-C had statutory authority to enter into the PSPA Amendment.  The answer depends on HERA.  Under HERA, the FHFA-C has exceptionally broad powers.  See Jacobs v. Fed. Hous. Fin. Agency, 908 F.3d 884, 889 (3d Cir. 2018) (noting that the FHFA-C's "powers are many and mostly discretionary"); see also Saxton v. Fed. Hous. Fin. Agency, 901 F.3d 954, 960 (8th Cir. 2018) (Stras, J., concurring) ("Congress came close to handing a blank check to the FHFA.").  The FHFA-C wields complete control over Freddie; it succeeds to the rights and powers of Freddie as well as its shareholders, directors, and officers.  12 U.S.C. § 4617(b)(2)(A)(i).  The FHFA-C may (but is not required to) use that power to, among other things, further the FHFA's interests, carry on Freddie's business, preserve and conserve Freddie's assets, and place Freddie in sound and solvent condition.[11]  Id. § 4617(b)(2)(B), (D),

---

[11]  The conclusion that the FHFA-C has some discretionary powers is buttressed by the fact that Congress stated the conservator "may" do certain things but "shall" do others.  See Huston v. United States, 956 F.2d 259, 262 (Fed. Cir. 1992) ("When, within the same statute, Congress uses both 'shall' and 'may,' it is differentiating between mandatory and discretionary tasks.").  Compare 12 U.S.C. § 4617(b)(2)(D) ("The [FHFA] may, as conservator, take such action as may be . . . necessary to put the regulated entity in sound and solvent condition . . . ."

(J) (noting actions that the FHFA-C "may" undertake); see also Roberts v. Fed. Hous. Fin. Agency, 889 F.3d 397, 403 (7th Cir. 2018) (explaining that Congress's use of "may" reflects that the FHFA-C has discretionary authority).

Congress's broad grant of power to the FHFA-C colors the analysis of whether the FHFA-C became the United States by approving the PSPA Amendment. As an initial matter, plaintiffs' contention that the FHFA-C exceeded its statutory authority by expropriating Freddie's assets for the government is unavailing because the FHFA-C is authorized to act in its own interest without regard for the effects on Freddie. Moreover, the FHFA-C's approval of the PSPA Amendment is in accordance with its authority to operate Freddie and preserve its assets. As an operating business, Freddie needed to "secure ongoing access to capital, manage debt loads, control cash flow, and decide whether and how to pay dividends." Jacobs, 908 F.3d at 890. The FHFA-C achieved those goals with the PSPA Amendment, which is, "in essence[,] a renegotiation of an existing lending agreement." Id. By agreeing to the PSPA Amendment, the FHFA-C eliminated the risk of Freddie consuming all of its financial lifeline (Treasury's funding commitment) through cash-dividend payments or entering a cycle of an ever-increasing liquidation preference.[12] Roberts, 889 F.3d at 404-05; see also Jacobs, 908 F.3d at 890 (noting that Freddie increased its future obligations and reduced its available funds by drawing funds from Treasury to pay the dividend); Saxton, 901 F.3d at 962 (Callas, J., concurring) ("Crushing dividend payments could have led the [Enterprises] toward insolvency."). The FHFA-C, with the amendment, also protected Freddie against future financial downturns.[13] See Jacobs, 908 F.3d at 890 ("The [PSPA Amendment] insured [Freddie] against downturns and 'death spirals,' preventing unpayable dividends from ratcheting up [its] debt load[] to unsustainable levels."); see also Roberts, 889 F.3d at 405 (noting that Freddie fared better in some years and worse in other years under the terms of the PSPA Amendment as compared to the previous agreements).

In light of the above, the FHFA-C's execution of the PSPA Amendment for Freddie was a "quintessential conservatorship task[]" that is appropriate under HERA. Perry II, 864 F.3d at 607. Although "stockholders no doubt disagree about the necessity and fiscal wisdom of the

---

(emphasis added)), with id. § 4617(b)(14)(A) ("The [FHFA] as conservator or receiver shall . . . maintain a full accounting of each conservatorship and receivership or other disposition of a[n Enterprise] in default." (emphasis added)).

[12] If, under the terms of the PSPA before the PSPA Amendment, Freddie chose to make its dividend payment by increasing Treasury's liquidation preference, the future dividends would be more expensive because the dividends were a set percentage of the liquidation preference. Making future dividends more expensive would, in turn, increase the likelihood that Freddie would again need to rely on increasing Treasury's liquidation preference rather than making a cash payment. The end result is a cycle in which Freddie continues to increase Treasury's liquidation preference.

[13] Although the FHFA-C anticipated continued profitability for Freddie in the near term, this fact does not undermine the propriety of the PSPA Amendment because ensuring the continued functioning of a company includes guarding against long-term risks. These long-term outlooks are especially important given the indefinite nature of the FHFA-C's role.

[PSPA Amendment] . . . , Congress could not have been clearer about leaving those hard operational calls to the FHFA's managerial judgment." Id.  In sum, the court joins the growing consensus that the FHFA-C acted within its statutory authority when it entered into the PSPA Amendment.  See Jacobs, 908 F.3d at 894; Saxton, 901 F.3d at 963; Roberts, 889 F.3d at 403; Robinson v. Fed. Hous. Fin. Agency, 876 F.3d 220, 231 (6th Cir. 2017); Perry II, 864 F.3d at 606.  But see Collins v. Mnuchin, 938 F.3d 553, 582 (5th Cir. 2019) (en banc) (holding, over the dissent of seven judges, that the plaintiffs stated a plausible claim that the FHFA-C exceeded its statutory authority), petitions for cert. filed 88 U.S.L.W. 3114 (U.S. Sept. 25, 2019) (No. 19-422), 88 U.S.L.W. 3146 (U.S. Oct. 25, 2019) (No. 19-563).  Thus, plaintiffs' theory that the FHFA-C is the United States because the FHFA-C exceeded its statutory authority is not persuasive.

### 3.  The FHFA-C was not coerced into approving the PSPA Amendment.

Plaintiffs also argue that the FHFA-C is the United States because the FHFA-C was coerced into approving the PSPA Amendment by Treasury.  Plaintiffs assert that Treasury coerced the FHFA-C into approving the PSPA Amendment because (1) Treasury drove the amendment process, (2) Treasury did not plan for the possibility that the FHFA-C would reject the amendment, and (3) the FHFA-C did not propose any alternatives to the amendment.  In the alternative, plaintiffs contend that the FHFA, in its role as regulator, coerced the FHFA-C to approve the amendment because the two entities were not acting independently.  Specifically, plaintiffs aver that the lines between the FHFA and the FHFA-C were blurred because (1) the FHFA's consent was required for any dividend payment and (2) the FHFA-C approved the amendment to achieve governmental objectives.

Defendant counters that the FHFA-C was not coerced by Treasury because the FHFA-C had a choice of whether to accept or reject the PSPA Amendment.  Defendant asserts that there is no coercion if a party has a choice, regardless of however difficult refusal of a particular option may be.  With respect to Treasury's involvement, defendant contends that plaintiffs fail to proffer any allegations that Treasury required the FHFA-C to enter into the agreement against its will.  Defendant further asserts that other courts have declined to conclude that the FHFA-C felt compelled to follow Treasury based on allegations that Treasury invented the amendment concept or led the process.  Defendant also argues that the FHFA-C was not coerced by the FHFA in the latter's role as regulator because there were clear statutory lines delineating the FHFA's authority in each role.[14]

### a.  The court has jurisdiction over claims based on actions that resulted from government coercion.

The court has jurisdiction over claims premised on the FHFA-C's actions if Treasury's "influence over the" FHFA-C "was coercive rather than merely persuasive."  A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1154 (Fed. Cir. 2014).  The line between coercion and

---

[14]  Defendant frames its argument as addressing whether the FHFA-C acted as an agent for the FHFA in its role as regulator, but defendant is responding to plaintiffs' coercion argument.

persuasion "is highly fact-specific." Id.  The precedent of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") frames the contours of the inquiry.  In Langenegger v. United States, the plaintiffs pleaded that the United States coerced El Salvador by threatening to withhold financial and military assistance unless El Salvador passed legislation expropriating private property.  756 F.2d 1565, 1567 (Fed. Cir. 1985).  The Federal Circuit disagreed with the plaintiffs' characterization of the threats because "[d]iplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of [coercion], however difficult refusal may be as a practical matter."  Id. at 1572.  Similarly, the Federal Circuit concluded in B & G Enterprises, Ltd. v. United States that California was not coerced into enacting restrictions on smoking, notwithstanding the federal government conditioning grants on states enacting such limits.  220 F.3d 1318, 1321, 1325 (Fed. Cir. 2000); see also A & D Auto, 748 F.3d at 1155 (explaining that "coercion was not established" in B & G).  The court explained that "it was California's decision to create [the] restrictions[;] . . . Congress may have provided the bait, but California decided to bite."  B & G, 220 F.3d at 1325.  In A & D Auto, the Federal Circuit addressed coercion in the context of the government allegedly conditioning vital financial assistance to bankrupt automobile companies on those companies terminating some of their franchise agreements.  748 F.3d at 1145.  Unable to resolve the issue due to gaps in the record, the court noted in dicta that a relevant consideration was "whether the government financing was essential to the companies."  Id.

A common thread runs through the Federal Circuit's decisions:  the importance of choice. A nonfederal actor is not coerced when it can choose to go against the wishes of the United States, even if doing so will cause significant hardships, Langenegger, 756 F.2d at 1567, or result in a loss of prospective benefits, id.; B & G, 220 F.3d at 1325.  But there is no choice, in any meaningful sense, when there is only one realistic option.  A & D Auto, 748 F.3d at 1145 (noting the importance of considering whether the companies could survive without accepting the government's offer); cf. Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) (noting that, with respect to Congress's spending powers, "the federal government may not, at least in certain circumstances, condition the receipt of funds in such a way as to leave the state with no practical alternative but to comply with federal restrictions").  Put differently, the nonfederal actor must make a voluntary decision, which it cannot do if there is only one realistic option.  See BMR Gold Corp. v. United States, 41 Fed. Cl. 277, 282 (1998) (finding that the "the necessary element of coerciveness" for a taking was missing because the plaintiff granted the military permission to cross his land); accord Henn v. Nat'l Geographic Soc., 819 F.2d 824, 826 (7th Cir. 1987) (noting that hard choices remain voluntary when they are not akin to "Don Corleone's '[m]ake him an offer he can't refuse'").  In sum, the FHFA-C was not coerced if it voluntarily chose to enter into the PSPA Amendment.

**b.  Plaintiffs have not established that Treasury coerced the FHFA-C into approving the PSPA Amendment.**

In support of their contention that Treasury coerced the FHFA-C into approving the PSPA Amendment, plaintiffs allege that Treasury proposed the terms of the amendment, and the FHFA-C did not make a counteroffer.  Those allegations are not enough to establish coercion. First, given Freddie's improving financial condition and Treasury's existing funding commitment, the FHFA-C's decision to execute the PSPA Amendment was voluntary because it

could reject the deals without imperiling Freddie.  The facts here, therefore, are diametrically opposed to the circumstances in A & D Auto that the Federal Circuit suggested may support coercion because the automobile dealers faced insolvency if they did not accede to the financing terms.  See 748 F.3d at 1145.  Second, the FHFA-C's lack of protestation is informative.  "[T]he very fact that FHFA[-C] itself [did] not br[ing] suit to enjoin the Treasury from the alleged coercion it was subjected to suggest[s] that FHFA[-C] was an independent, willing participant in its negotiations with the Treasury."  Robinson v. Fed. Hous. Fin. Agency, 223 F. Supp. 3d 659, 668 (E.D. Ky. 2016), aff'd, 876 F.3d at 220.  The court's conclusion is bolstered by the fact that another court has held that materially similar allegations to those at issue here did not "come close to a reasonable inference that [the] FHFA[-C] considered itself bound to do whatever Treasury ordered."  Perry Capital LLC v. Lew, 70 F. Supp. 3d 208, 226 (D.D.C. 2014) ("Perry I"), aff'd in part, rev'd in part sub nom. Perry II, 864 F.3d at 591.  This court agrees with the reasoning in Perry I:  the PSPA Amendment was executed by sophisticated parties, and many agreements arise from a party's proposal being accepted by the other party.  Id.

**c. Plaintiffs have not established that the FHFA coerced the FHFA-C into approving the PSPA Amendment.**

Plaintiffs also have not alleged facts reflecting that the FHFA coerced the FHFA-C into agreeing to the PSPA Amendment.  As an initial matter, plaintiffs have not alleged that the FHFA unduly influenced the FHFA-C's decision-making process with respect to the proposed agreement.  They merely allege that the FHFA did not silo its regulatory and conservator roles.  The lack of a firewall (without more), however, does not indicate that the FHFA deprived the FHFA-C of meaningful choice.  Moreover, plaintiffs' focus on the FHFA-C allegedly pursuing government objectives when it approved the PSPA Amendment is a red herring.  The purported pursuit of government objectives is not germane to the coercion inquiry because it does not suggest that the FHFA-C lacked any choice in the matter.  Even if it was relevant to coercion (or to some other theory for jurisdiction), plaintiffs would not prevail because Congress permitted the FHFA-C to act in the interests of the government.  See 12 U.S.C. § 4617(b)(2)(J) (allowing the FHFA-C to "take any action" that "is in the interests of the [Enterprises] or the [FHFA]").  The mere pursuit of government objectives, therefore, would not reflect a blending of any roles but rather the FHFA-C using powers afforded to it by Congress.

In conclusion, plaintiffs have not established that the FHFA-C was coerced into approving the PSPA Amendment by Treasury or the FHFA.

**4. The FHFA-C is not Treasury's agent.**

Plaintiffs further argue that the FHFA-C's actions are attributable to the United States because the FHFA-C is Treasury's agent.  Plaintiffs assert that the FHFA-C is a government agent because (1) Treasury, by virtue of the PSPA, had a major role in conservator decisions; (2) the FHFA-C approved the PSPA Amendment for the taxpayers' benefit; and (3) the FHFA-C could not have approved the amendment absent statutory authority.  Defendant counters that plaintiffs have not pleaded an agency relationship because Treasury does not control the FHFA-C's operations and is statutorily barred from exercising such control.

The United States is subject to claims in this court for the actions of a third party "if [that] party is acting as the government's agent . . . ." A & D Auto, 748 F.3d at 1154. "An essential element of agency is the principal's right to control the agent's actions." Hollingsworth v. Perry, 570 U.S. 693, 713 (2013) (quoting Restatement (Third) of Agency § 1.01 cmt. f (Am. Law. Inst. 2005)); accord O'Neill v. Dep't of Hous. & Urban Dev., 220 F.3d 1354, 1360 (Fed. Cir. 2000) (acknowledging that the common-law meaning of agency requires, among other things, that the principal has the right to control the agent's conduct); see also Preseault v. United States, 100 F.3d 1525, 1537 (Fed. Cir. 1996) (concluding that a state's actions were attributable to the United States when the state acted pursuant to the Interstate Commerce Commission's order); Hendler v. United States, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991) (attributing a state's actions to the United States when the state acted under authority flowing from an Environmental Protection Agency order). The facts, as alleged, do not reflect that Treasury controlled the FHFA-C's actions because Congress explicitly precluded the FHFA-C from being subservient to another agency, 12 U.S.C. § 4617(a)(7) (providing that the FHFA-C cannot be subject to the "direction or supervision" of any other agency), and plaintiffs have not alleged facts indicating that Treasury exercised such control notwithstanding the statutory bar. Although the FHFA-C was required by the PSPA to obtain Treasury's approval for certain actions (e.g., issuing dividends), the PSPA did not provide Treasury with the right to unilaterally order an amendment to the agreement. Moreover, plaintiffs describe an FHFA-C that made decisions independently; Treasury "urg[ed]" the FHFA to pursue conservatorship and "push[ed]" for the PSPA Amendment. Am. Derivative Compl. ¶¶ 56, 150. Simply stated, plaintiffs have not alleged facts establishing that Treasury exercised the control over the FHFA-C that is necessary for an agency relationship.

### 5. The FHFA-C is the United States because the FHFA-C retains the FHFA's governmental character.

Finally, plaintiffs contend that the FHFA-C is itself a government actor.[15] Defendant disagrees. First, relying on O'Melveny & Myers v. FDIC, 412 U.S. 79 (1994), defendant argues that the FHFA-C is not the United States because the FHFA-C stands in Freddie's shoes. Specifically, defendant asserts that Congress's decision to have the FHFA-C succeed to Freddie's rights reflects that Congress intended that the FHFA-C step into Freddie's private shoes and shed its government character. Second, defendant argues that the FHFA-C's exercise

---

[15] Plaintiffs do not adopt the portion of the joint response brief that most directly addresses defendant's arguments in this regard. However, both in their amended complaint and in their supplemental response brief, plaintiffs assert that the FHFA-C was a government actor when it approved the PSPA Amendment. See Am. Derivative Compl. ¶¶ 17-20, 223; Pls.' Supp'l Mem. in Opp'n to Def.'s Omnibus Mot. to Dismiss 2-3. Indeed, plaintiffs contend that when the FHFA-C agreed to the PSPA Amendment it did so while "function[ing] as a Government regulator." Am. Derivative Compl. ¶ 231. Further, plaintiffs have adopted other arguments made by counsel for the plaintiffs in the related cases during the oral argument held in November 2019. See supra text accompanying note 9. For these reasons, the court references some arguments that were not specifically presented by plaintiffs to explain its holding here.

of nontraditional conservatorship powers is immaterial because Congress can expand the conservator's role without transforming it into a government actor.

In response, plaintiffs dispute the premise of defendant's argument that, pursuant to O'Melveny, the FHFA becomes Freddie when acting as conservator. Plaintiffs assert that O'Melveny does not concern whether an entity is the United States or, if the decision can be read as addressing that issue, is distinguishable because it concerns receivers or is limited to conservators exercising traditional conservator powers. Second, plaintiffs argue that the FHFA has not shed its government status, even if it has stepped into Freddie' shoes, when it acts as conservator. Specifically, plaintiffs assert that the FHFA-C retains the FHFA's government status because (1) the FHFA-C has acted beyond the traditional conservator powers and (2) Congress expressed its intention for that result by precluding the conservator from being subject to the supervision of "any other agency." 12 U.S.C. § 4617 (emphasis added).

In short, the parties disagree over the government status of the FHFA-C. The FHFA is indisputably the United States, see id. § 4511(a) (establishing the FHFA as an "independent agency of the Federal Government"), and so the only question is whether the FHFA sheds that status when it acts as conservator. In other jurisdictions, courts have held (with near unanimity) that the FHFA loses its government status pursuant to O'Melveny. In O'Melveny, the United States Supreme Court ("Supreme Court") explained that the FDIC "steps into [the] shoes" of a private company when acting as receiver and sheds its government character because the FDIC "succeed[s] to . . . all rights, titles, powers, and privileges of the [entity in receivership] . . . ." 512 U.S. at 86 (quoting 12 U.S.C. § 1821(d)(2)(A)(i)); see also AG Route Seven P'ship v. United States, 57 Fed. Cl. 521, 534 (2003) (citing O'Melveny for the proposition that the FDIC as receiver is a "private party, and not the government per se" because it "is merely standing in the shoes . . . of the defunct thrift"). The courts drawing from O'Melveny have concluded that the FHFA steps into the shoes of Freddie and sheds its government character when acting as conservator because Congress provided that the FHFA-C exercises the same rights with respect to Freddie as Congress granted to the FDIC as receiver. See, e.g., Herron v. Fannie Mae, 861 F.3d 160, 169 (D.C. Cir. 2017); cf. Ameristar Fin. Servicing Co. v. United States, 75 Fed. Cl. 807, 811 (2007) (concluding, with respect to the FDIC, that the step-into-the-shoes principle set forth in O'Melveny also applies in the conservator context).

### a. The FHFA-C is not the United States if the FHFA steps into Freddie's shoes when acting as conservator.

Plaintiffs initially contend that defendant's reliance on O'Melveny is a red herring because, assuming that O'Melveny applies, the FHFA-C is the United States even though it steps into Freddie's shoes. Specifically, plaintiffs assert that the FHFA-C is the United States under the facts alleged because (1) the FHFA-C exercises nontraditional conservator powers, and (2) Congress intended that the FHFA-C retain the FHFA's government status. The court addresses each assertion in turn.

First, the FHFA-C did not become a government actor by exercising powers beyond those traditionally afforded to a conservator. As a threshold matter, plaintiffs have not alleged facts reflecting that the FHFA-C used such powers; the execution of the PSPA Amendment was

a "quintessential conservatorship" function. <u>Perry II</u>, 864 F.3d at 607; <u>see also</u> <u>supra</u> Section IV.A.2 (discussing the FHFA-C's exercise of its powers). More importantly, however, plaintiffs would not prevail even if the FHFA-C exercised nontraditional conservatorship powers in agreeing to the PSPA Amendment. When this argument was pressed in other jurisdictions, it was rejected:

> It may well be true that FHFA's actions would not be allowed under traditional principles of corporate or conservatorship law, but it does not follow that those actions are therefore governmental. Legislatures can expand conservatorship and similar powers without transforming conservators into agents of the government. <u>Cf.</u> <u>Pegram v. Herdrich</u>, 530 U.S. 211, 225-26 (2000) (explaining that the Employee Retirement Income Security Act altered the common law of trusts to permit certain actions that would otherwise violate the trustee's fiduciary duties).

<u>Bhatti v. Fed. Hous. Fin. Agency</u>, 332 F. Supp. 3d 1206, 1226 (D. Minn. 2018) (footnote omitted). The court agrees with that reasoning, and plaintiffs provide no authority that supports a contrary result. Although plaintiffs state that the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") decision in <u>Waterview Management Co. v. FDIC</u>, 105 F.3d 696 (D.C. Cir. 1997), supports their position, they are mistaken. <u>Waterview</u> is not on point because the D.C. Circuit did not hold that a conservator is <u>per se</u> the United States when acting pursuant to a congressional grant of broad powers. Rather, it held that, as a matter of statutory interpretation, the existence of a receivership did not preempt a prereceivership contract. <u>Id.</u> at 699-702.

Second, Congress's instruction that the FHFA-C is not subject to the supervision of any other agency does not reflect congressional intent for the FHFA to retain its government status when acting as conservator even if it steps into the shoes of Freddie. Because the court only reaches this issue by assuming that <u>O'Melveny</u> is instructive, the statutory language concerning supervision of the FHFA-C does not support a finding of jurisdiction because the same language is present in the statute that the Supreme Court addressed in <u>O'Melveny</u>. <u>See</u> 512 U.S. at 85-86 (discussing 12 U.S.C. § 1821). <u>Compare</u> 12 U.S.C. § 1821(c)(3)(C) ("When acting as conservator or receiver . . . , [the FDIC] shall not be subject to the direction or supervision of any other agency or department of the United States or any State in the exercise of the [FDIC's] rights, powers, and privileges."), <u>with</u> <u>id.</u> § 4617(a)(7) ("When acting as conservator or receiver, the [FHFA] shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of the [FHFA]."). In sum, the FHFA-C does not become the United States if the FHFA steps into Freddie's shoes when serving as conservator.

### b. The FHFA-C retains the FHFA's government character because the FHFA-C does not step into Freddie's shoes.

The key inquiry, therefore, is whether the FHFA steps into the shoes of Freddie when acting as conservator. Defendant argues that the FHFA-C sheds its government character and assumes the identity of Freddie based on the reasoning in <u>O'Melveny</u>. Defendant's reliance on

O'Melveny is misplaced.  O'Melveny concerns a receiver stepping into the shoes of a failed bank.  512 U.S. at 86.  The roles of a conservator and receiver are meaningfully different.  In a recent decision, the United States District Court for the District of Rhode Island artfully explained the differences and their import for assessing whether the FHFA-C is the government:

> The O'Melveny Court held that FDIC, when acting as a receiver for a private entity, steps into the shoes of that private entity for state law claims.  This holding makes sense given the purpose of receivership:  "to preserve a company's assets, for the benefit of creditors, in the face of bankruptcy."  When FDIC is appointed receiver, it must dispose of the received entity's assets, resolving obligations and claims made against the entity.  Notably, "[i]n receivership, the receiver owes fiduciary duties to the creditors, which the corporation would otherwise owe to creditors during a period of insolvency."  It logically follows, then, that the receiver steps into the shoes of the private entity, because it assumes the fiduciary duties of that entity.
>
> Conservatorship, in contrast, serves a different function.  FHFA has described the purpose of conservatorship is "to establish control and oversight of a company to put it in a sound and solvent condition."  Conservators, unlike receivers, have a fiduciary duty running to the corporation itself.
>
> This is "critically distinct" from the fiduciary duties owed as a receiver— the receiver does indeed "step into the shoes" of the entity by assuming the fiduciary duties of the entity, but the conservator does not:  it remains distinct, and rather owes a duty to the entity.  Given the difference in fiduciary duties, O'Melveny's "steps into the shoes" holding makes sense in the context of receivership, but not in the context of conservatorship.

Sisti v. Fed. Hous. Fin. Agency, 324 F. Supp. 3d 273, 282-83 (D.R.I. 2018) (citations and footnotes omitted).  See generally Brian Taylor Goldman, The Indefinite Conservatorship of Fannie Mae and Freddie Mac Is State-Action, 17 J. Bus. & Sec. L. 11, 23-30 (2016).  The district court, relying on the above analysis, declined to treat the FHFA-C as a private actor.  Sisti, 324 F. Supp. 3d at 284.  This court agrees with the reasoning and conclusion in Sisti:  the FHFA does not shed its government character when acting as conservator because it does not step into the shoes of Freddie.  Otherwise stated, the FHFA-C is the United States because it retains the FHFA's government character.  Plaintiffs' claims, therefore, are against the United States for purposes of the Tucker Act.

**B.  The court lacks jurisdiction over claims that sound in tort, but defendant has not shown that any of plaintiffs' claims are tort claims.**

Defendant next argues that plaintiffs' Fifth Amendment takings and illegal-exaction claims sound in tort because they are premised on purported misconduct by the FHFA-C.[16]  The

---

[16]  In its notice of arguments, defendant asserts that it is arguing in its motion to dismiss for the dismissal of plaintiffs' derivative fiduciary duty claim because that claim is a tort claim.

court, pursuant to the Tucker Act, lacks jurisdiction over tort claims.  28 U.S.C. § 1491(a)(1).
Plaintiffs counter that they have pleaded the predicates for takings and illegal-exaction claims,
which means that it is irrelevant whether they also alleged facts that are germane to tortious
actions.

When a party pleads the predicate for a takings claim or illegal-exaction claim, the court
possesses jurisdiction to entertain such a claim.  See Hansen v. United States, 65 Fed. Cl. 76,
80-81 (2005) ("[S]o long as there is some material evidence in the record that establishes the
predicates for a [claim covered by the Tucker Act,] . . . a plaintiff succeeds in demonstrating
subject matter jurisdiction in this court . . . .").  Those claims, at a basic level, are contentions
that the government expropriated private property lawfully (takings) or unlawfully (illegal
exaction).  See Orient Overseas Container Line (UK) Ltd. v. United States, 48 Fed. Cl. 284, 289
(2000) ("Takings claims arise because of a deprivation of property that is authorized by law.
Illegal exactions arise when the government requires payment in violation of the Constitution, a
statute, or a regulation." (citing Dureiko v. United States, 209 F.3d 1345, 1359 (Fed. Cir. 2000);
Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967))).  If a party alleges
the necessary predicates for these claims, the court is not deprived of jurisdiction even if the
complaint contains allegations that could support a tort claim.  See El-Shifa Pharm. Indus. Co. v.
United States, 378 F.3d 1346, 1353 (Fed. Cir. 2004) ("That the complaint suggests the United
States may have acted tortiously towards the appellants does not remove it from the jurisdiction
of the Court of Federal Claims."); Rith Energy, Inc. v. United States, 247 F.3d 1355, 1365 (Fed.
Cir. 2001) (explaining that this court has jurisdiction over a takings claim "even if the
government's action was subject to legal challenge on some other ground").  Here, plaintiffs
plead the predicates for takings and illegal-exaction claims by alleging, in essence, that they were
forced to give their property to the government because of lawful or unlawful government
conduct.  Therefore, it is of no import to the court's jurisdiction whether plaintiffs have alleged
facts that would also support a tort claim.

## V. STANDING

In addition to asserting that the court lacks subject-matter jurisdiction to entertain
plaintiffs' claims, defendant challenges plaintiffs' standing to pursue their claims.  Specifically,
defendant contends that plaintiffs are collaterally estopped from asserting standing in this suit,
and that they lack standing for their derivative claims because the right to bring such claims was

---

After reviewing the motion, however, it is apparent that defendant presents no argument
concerning the tortious nature of plaintiffs' derivative fiduciary duty claim, but instead addresses
its arguments to fiduciary duty claims brought directly by shareholders.  The court, therefore,
reserves judgment on whether it has jurisdiction over plaintiffs' derivative fiduciary duty claim.

transferred to the FHFA-C.  A plaintiff bears the burden of demonstrating that it has standing for each claim.  Starr Int'l Co. v. United States, 856 F.3d 953, 964 (Fed. Cir. 2017).

### A.  Plaintiffs are not collaterally estopped from litigating whether they have standing to litigate their derivative claims.

Defendant first argues that plaintiffs are collaterally estopped from litigating whether shareholders have standing to bring derivative claims because shareholders of Freddie previously litigated and lost that issue in Perry I.[17]  Plaintiffs disagree.  First, plaintiffs assert that the issue here is different than that issue in Perry I because plaintiffs are asserting constitutional claims (which were not pleaded in Perry I), and the district court was not bound by this jurisdiction's binding precedent.  Second, plaintiffs contend that they lack privity with the Perry I plaintiffs because the district court concluded those litigants lacked capacity to sue on behalf of Freddie.  Third, plaintiffs assert that two exceptions to collateral estoppel apply:  The standing issue is a matter of general interest that has not been resolved by the Supreme Court, and there is no preclusion if the prior decision conflicts with binding precedent.

A party can be collaterally estopped from litigating "an issue if an identical issue was actually litigated and necessarily decided in a prior case where the interests of the party to be precluded were fully represented."  Simmons v. Small Bus. Admin., 475 F.3d 1372, 1374 (Fed. Cir. 2007); see also In re Freeman, 30 F.3d 1459, 1467 (Fed. Cir. 1994) (acknowledging that a court may decline to apply issue preclusion when doing so would be unfair).  "The party asserting issue preclusion bears the burden to establish each of these elements."  Jones v. United States, 846 F.3d 1343, 1361 (Fed. Cir. 2017).  As germane to the instant case, a shareholder's interests are fully represented by another shareholder litigating a derivative suit on behalf of the corporation because the corporation is the real party in interest.  See, e.g., Arduini v. Hart, 774 F.3d 622, 634 (9th Cir. 2014) ("Shareholders bringing derivative suits are in privity for the purposes of issue preclusion.").  A shareholder's interests, however, are not fully represented by the litigant in the earlier case if that litigant lacked capacity to sue on the corporation's behalf.[18]  See 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1840 (3d. ed. 2019) ("[A]ny dismissal or judgment that is not on the merits but that relates to the representative's capacity to bring the suit . . . will not bar other stockholders from bringing a derivative action."); see also Sonus Networks, 499 F.3d at 64 (allowing preclusion "[i]f the shareholder can sue on the corporation's behalf").

[17]  The court uses "collateral estoppel" and "issue preclusion" to refer to the same principle.  See Jet, Inc. v. Sewage Aeration Sys., 223 F.3d 1360, 1366 (Fed. Cir. 2000) (noting that the terms are used interchangeably).

[18]  Defendant challenges this framing of the law by relying on decisions in which courts addressed the preclusive effect of dismissals in derivative suits for litigants' failure to satisfy the requirement for demand futility.  See, e.g., In re Sonus Networks, Inc, S'holder Derivative Litig., 499 F.3d 47, 64 (1st Cir. 2007).  But those decisions involved litigants who, notwithstanding their failure to comply with the specific procedural requirements, had the capacity to sue.  See id. at 53-71.  In contrast, the district court in Perry I concluded that the shareholders in that case lacked the capacity to bring the derivative claims they asserted.  70 F. Supp. 3d at 233.

In Perry I, shareholders of Freddie asserted derivative, nonconstitutional claims on behalf of Freddie. 70 F. Supp. 3d at 229.  The district court explained that Congress, via HERA, transferred shareholders' rights to bring derivative suits to the FHFA-C and an exception to the bar on shareholders bringing such suits would contravene the plain language of the statute.  Id. at 230-32.  Therefore, the district court concluded that the Perry I plaintiffs lacked capacity to pursue derivative claims on behalf of Freddie and dismissed those claims.  Id. at 233.

Defendant is correct that plaintiffs are attempting to litigate the same issue that was actually litigated and necessarily decided in Perry I.  First, the issue here is the same as the one presented in Perry I:  whether, in light of HERA, shareholders of Freddie can litigate a derivative claim on Freddie's behalf.  It is of no import that Perry I concerned nonconstitutional claims, while plaintiffs here assert both constitutional and nonconstitutional claims.  See Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (noting that preclusion applies "even if the issue recurs in the context of a different claim").  Plaintiffs fare no better by arguing that the issue is different because the district court was not bound by the same precedent that applies in this court.  This exception, if accepted, would swallow the rule by limiting preclusion to courts within the same circuit.  Such a limitation runs contrary to the goals of collateral estoppel:  "protect[ing] parties] from the expense and vexation attending multiple lawsuits, conserving judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-54 (1979).  Second, the issue here was actually decided in Perry I.  See 70 F. Supp. 3d at 230-33.  Third, the resolution of a shareholder's capacity to sue was a necessary part of that decision because defendant had moved to dismiss for lack of standing.  Id. at 219.

Although defendant has established the first three elements of issue preclusion, it has not established the fourth element:  whether plaintiffs' interests were adequately represented in the prior case.[19]  As noted above, shareholders' interests are adequately represented by other shareholders litigating a derivative claim when the litigating shareholders can and do sue on behalf of the company.  Such litigation did not occur in Perry I; the district court concluded that the shareholders lacked capacity to litigate derivative claims on behalf of Freddie.  Because the Perry I plaintiffs lacked capacity to represent Freddie, the decision affecting those litigants has no bearing on Freddie or the rights of the other shareholders who were not parties to that suit.  Therefore, plaintiffs are not collaterally estopped from litigating standing in this case by the decision in Perry I.[20]

_____

[19]  The court's conclusion is buttressed by the fact that, following Perry I, other courts have adjudicated derivative claims brought by Fannie and Freddie shareholders without relying on issue preclusion.  See, e.g., Saxton v. Fed. Hous. Fin. Agency, 245 F. Supp. 3d 1063, 1075 (N.D. Iowa 2017) (determining whether the plaintiffs had standing after rejecting defendant's argument to apply issue preclusion), aff'd, 901 F.3d at 954; cf. Roberts v. Fed. Hous. Fin. Agency, 243 F. Supp. 3d 950, 957-58 (N.D. Ill. 2017) (addressing the merits of plaintiffs' claims despite defendant's argument that plaintiffs lacked standing), aff'd, 889 F.3d at 397.

[20]  Because defendant did not establish every element of issue preclusion, there is no need to address plaintiffs' arguments that an exception to the doctrine is applicable.

**B. Plaintiffs have standing to litigate derivative claims because the FHFA-C has a conflict of interest.**

Independent of any issue preclusion, defendant argues that plaintiffs lack standing to litigate derivative claims because Congress transferred to the FHFA-C the right to bring derivative claims on behalf of Freddie.  Defendant asserts that Congress stripped the shareholders of the right to bring derivative suits by including in HERA a succession clause—a provision stating that the FHFA-C succeeds to all shareholder rights with respect to Freddie. Defendant further contends that the court should not recognize an exception to that rule when the FHFA-C has a conflict of interest because an exception is not supported by HERA's language and would frustrate Congress's intent to insulate the conservator from judicial scrutiny by allowing shareholders to challenge the FHFA-C's decisions.  Defendant avers that the Federal Circuit's decision in First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1282 (Fed. Cir. 1999), which recognized a conflict-of-interest exception in a similar statute, is inapplicable because the Federal Circuit limited its ruling to receiverships and claims that predated the receivership.

Plaintiffs counter that they can maintain derivative claims on behalf of Freddie despite the apparent prohibition in HERA.  They argue that the court cannot interpret HERA to preclude plaintiffs' derivative takings and illegal-exaction claims because eliminating a remedy for constitutional transgressions violates due process.  They also argue, relying on First Hartford, that they can assert derivative claims because the FHFA-C has a manifest conflict of interest. Plaintiffs assert that First Hartford is controlling because the Federal Circuit recognized the conflict exception in the context of a succession clause identical to the one in HERA.  Plaintiffs also contend that First Hartford is not limited to (1) receivers because the Federal Circuit did not rely on any particular aspect of receivership or (2) prereceivership claims because the court's focus was on the receiver's conflict of interest.

The initial consideration here—the import of HERA's succession clause—is a matter of statutory interpretation.  The court begins with the language of the statute.  Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999).  "If Congress has expressed its intention by clear statutory language, that intention controls and must be given effect."  Rosete v. Office of Pers. Mgmt., 48 F.3d 514, 517 (Fed. Cir. 1995); accord Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  If the statutory language is clear, the court's inquiry is complete.  Hughes Aircraft, 525 U.S at 438.

In the succession clause, Congress provided that the FHFA-C "immediately succeed[s] to" every shareholder's "rights, titles, powers and privileges . . . with respect to the [Enterprise] and the assets of the [Enterprise]."  12 U.S.C. § 4617(b)(2)(A).  One of the shareholders' rights with respect to Freddie is the right to bring a derivative suit.  See Perry II, 864 F.3d at 624; see also RCFC 23.1 (limiting derivative suits to shareholders).  Therefore, it is apparent that HERA contains a prohibition on shareholder derivative suits because the right to assert such claims is transferred to the FHFA-C.  Indeed, other courts considering the issue have concluded that there is such a prohibition.  E.g., Kellmer v. Raines, 674 F.3d 848, 850 (D.C. Cir. 2012) (concluding

that Congress "plainly transfer[red] shareholders' ability to bring derivative suits . . . to FHFA"); La. Mun. Police Emps. Ret. Sys. v. Fed. Hous. Fin. Agency, 434 F. App'x 188, 191 (4th Cir. 2011) (per curiam) (same). If the court were writing on a blank slate, it would also conclude that Congress foreclosed shareholders from asserting derivative claims while Freddie is in conservatorship.

The court, however, is not writing on a blank slate. Rather, it must render a decision in light of existing precedent—specifically, First Hartford. In First Hartford, the FDIC was serving as the receiver for Dollar Dry Dock Bank of New York ("Dollar"), and a Dollar shareholder filed a derivative claim on the bank's behalf asserting that the FDIC breached a contract with Dollar before the receivership. 194 F.3d at 1282. A judge on this court dismissed the claim for lack of standing after explaining that the FDIC was the only entity that could bring derivative claims for Dollar because, under the relevant statute, the FDIC as receiver succeeded to all shareholder rights. Id. at 1294. The Federal Circuit disagreed. Id. It acknowledged "that, as a general proposition, the FDIC's statutory receivership authority includes the right to control the prosecution of legal claims on behalf of the [bank] now in its receivership." Id. at 1295. But the Federal Circuit, without addressing the statutory language, focused on the purpose of derivative suits: "permit[ting] shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation." Id. The Federal Circuit reasoned that the plaintiff had standing because, "most significantly," of "the conflict of interest faced by the FDIC in determining whether to bring suit." Id. Indeed, "the FDIC was asked to decide on behalf of [Dollar] whether [the FDIC] should sue the federal government based upon a breach of contract, which if proven was caused by the FDIC itself." Id. Simply stated, the Federal Circuit held that a shareholder of a company could bring a derivative claim, notwithstanding a succession clause, if the company was controlled by an entity with a conflict of interest. Id. at 1283.

First Hartford is instructive because the Federal Circuit was addressing the same issue that is present in this case: whether shareholders can assert a derivative claim when there is a succession clause transferring shareholders' rights to another entity. See id. at 1294-95. First Hartford is also informative because Congress, after that case was decided, included in HERA the same succession clause that was at issue in the Federal Circuit's decision, compare 12 U.S.C. § 1821(d)(2)(A)(i) (1994) (succession clause at issue in First Hartford), with 12 U.S.C. § 4617(b)(2)(A)(i) (succession clause promulgated in HERA), and "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, Congress' intent to incorporate such interpretations as well,"[21] Bragdon v. Abbott, 524 U.S. 624, 626 (1998). But see Perry II, 864 F.3d at 625 (declining to conclude that Congress intended sub silentio to incorporate into HERA the conflict-of-interest exception recognized by two appellate courts).

---

[21] Before Congress enacted HERA, at least one other appellate court recognized a conflict-of-interest exception to the limitation on derivative suits resulting from a succession clause identical to the one that Congress ultimately incorporated into HERA. See Delta Sav. Bank v. United States, 265 F.3d 1017, 1022-23 (9th Cir. 2001).

The court is not swayed by defendant's arguments that First Hartford is distinguishable because it involved a receiver or claims predating the receivership. The Federal Circuit did not premise its decision on the unique attributes of receiverships or the timing of the claims; it concluded that the plaintiffs had standing "only . . . because of the FDIC's conflict of interest." Id. at 1283; accord id. at 1295 (explaining that it held that the plaintiffs had standing based on the FDIC's refusal to sue and, "most significantly, upon the conflict of interest faced by the FDIC"). Defendant fares no better with its argument that First Hartford is not instructive because the Federal Circuit limited its holding "to the situation . . . in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same agency." Id. at 1295. Read in context, the Federal Circuit merely acknowledged that it was "neither infer[ring] nor express[ing] an opinion" on what other circumstances would involve the necessary conflict for a shareholder to acquire standing when there is a succession clause. Id. The Federal Circuit was not stating that the conflict-of-interest exception does not apply in other situations. Indeed, the court recognized that the exception would apply outside of the circumstance presented in First Hartford. See id. ("We stress that such standing could only occur in a narrow range of circumstances."). The court, therefore, is guided by First Hartford insofar as the necessary conflict of interest exists.

The court, having identified the relevant framework, returns its focus to plaintiffs' derivative claims. Those claims are premised, at least in part, on the FHFA-C's purported conduct. Similar to First Hartford, the FHFA-C would need to decide on behalf of Freddie whether it should sue the federal government based on claims, which, if proven, are rooted in the FHFA-C's actions. See 194 F.3d at 1295. That decision presents a conflict of interest for the FHFA-C such that plaintiffs have standing to litigate their derivative claims on behalf of Freddie.

## VI.  MERITS

In addition to seeking the dismissal of plaintiffs' takings and illegal-exaction claims for lack of subject-matter jurisdiction and standing, defendant moves to dismiss these claims for failure to state a claim on which relief can be granted. Defendant raises two contentions relevant to plaintiffs' takings and illegal-exaction claims. The court addresses these contentions in turn.

### A.  Plaintiffs' allegations of illegal conduct do not defeat their takings claim.

Defendant first argues that plaintiffs fail to state a plausible takings claim because they allege that the FHFA-C acted illegally. Specifically, defendant asserts that the claims fail because unauthorized government conduct cannot effect a taking. Plaintiffs counter that they merely pleaded in the alternative by alleging that the government is either liable for a taking (because its actions were lawful) or an illegal exaction (because it acted illegally).[22] Notably, defendant did not return to this argument in its reply.

---

[22] This contention is found in plaintiffs' amended complaint. See Am. Derivative Compl. 1, 5-6, 57-59. Although plaintiffs did not adopt this particular argument in their opposition to the government's challenge to the plausibility of their takings claim, other plaintiffs in related cases demonstrated the flaw in the government's position. Accord supra note 15.

The court is not swayed by defendant's argument.  When the government expropriates property, a plaintiff can obtain relief under either a takings theory or an illegal-exaction theory, Orient Overseas Container Line, 48 Fed. Cl. at 289, but not both, Figueroa v. United States, 57 Fed. Cl. 488, 496 (2003), aff'd, 466 F.3d 1023 (Fed. Cir. 2006).  The winning claim depends on the facts established; a takings claim requires lawful conduct, while an illegal-exaction claim is premised on unauthorized conduct.  Figueroa, 57 Fed. Cl. at 496.  Although those claims are mutually exclusive, a plaintiff can assert both and proceed past the pleading stage because a complaint can contain inconsistent claims.  Id.; accord RCFC 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency.").  Having asserted both takings and illegal-exaction claims, plaintiffs' allegations of unlawful conduct are insufficient to defeat their takings claim at this stage.

**B. Plaintiffs' illegal-exaction claim survives because defendant does not address each theory plaintiffs proffer for why the PSPA Amendment was not authorized.**

Next, defendant frames plaintiffs' illegal-exaction claim as premised on a violation of HERA and argues that plaintiffs have not alleged any unauthorized conduct because the FHFA-C and Treasury acted within their authority under HERA when they approved the PSPA Amendment.  Plaintiffs counter that they identified three reasons why the revision to the PSPA was illegal.  Specifically, plaintiffs argue that they allege that (1) the FHFA-C and Treasury exceeded their authority under HERA, (2) the FHFA-C violated its own regulations, and (3) the FHFA-C's approval of the PSPA Amendment was unconstitutional because the FHFA is structured in a manner that violates separation-of-powers principles.  Plaintiffs also note that defendant failed to even address the allegations of unconstitutional conduct.  Defendant uses its reply brief to double down on its argument that the FHFA-C and Treasury acted within their statutory authority and to add a contention that the FHFA-C did not violate the applicable regulations.  Notably, however, defendant remains silent on the alleged constitutional violation.

An illegal-exaction claim is a demand for "money that was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'"  Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting Eastport, 372 F.2d at 1007).  Defendant takes aim at a core tenet of such a claim:  the requirement for an unauthorized action.  But defendant presses no argument on why plaintiffs' allegations that the FHFA is unconstitutionally structured are insufficient to sustain their illegal-exaction claim.  Defendant also does not present any argument recognized by the court on why the FHFA-C's purported violation of its own regulations is not sufficient to establish the necessary illegality for an illegal-exaction claim.  Although defendant addresses that issue in its reply brief, it had already waived the argument by not addressing the purported regulatory violation in its motion to dismiss.  See United States v. Ford Motor Co., 463 F.3d 1267, 1277 (Fed. Cir. 2006) (explaining that "[a]rguments raised for the first time in a reply brief are not properly before this court"); Ironclad/EEI v. United States, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of this circuit, arguments not presented in a party's principal brief to the court are typically deemed to have been waived").  Thus, defendant has not met its burden of establishing that plaintiffs fail to state a plausible illegal-exaction claim for Freddie.

## VII.  CONCLUSION

For the reasons stated above, the court declines to dismiss plaintiffs' claims.  The court therefore **DENIES** defendant's motion to dismiss.  As stated in the court's order of March 19, 2020, the court now **CONTINUES** the stay in this matter pending the resolution of the interlocutory appeal proceedings before the Federal Circuit in the Fairholme matter, except as to the actions discussed below.  Accordingly, the court also **DENIES** plaintiffs' motion to lift the stay in this matter.  Should any party wish to present a formal request for certification of an interlocutory appeal in this matter, such a motion, specifying the legal questions to be certified, and applying the standard set forth in Fairholme III, must be filed by **no later than Monday, May 18, 2020.**

The court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all the parties agree.  Then, **by no later than Monday, May 18, 2020,** the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

## VIII.  CERTIFICATION FOR INTERLOCUTORY APPEAL

On June 11, 2020, the court granted plaintiffs' motion to certify this opinion for interlocutory appeal.  As stated in that order, the court is appending the following language to this opinion:

The court finds that this opinion involves the following controlling questions of law with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from the opinion may materially advance the ultimate termination of the litigation:

(1) Whether plaintiffs have standing to assert derivative claims notwithstanding HERA's succession clause.

(2) Whether the FHFA-C's actions are attributable to the United States such that the court possesses subject-matter jurisdiction to entertain plaintiffs' derivative takings and illegal exaction claims.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge

-27-